IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| TOMTOM INC.,<br><br>    *Plaintiff/Counter-Defendant*,<br><br>v.<br><br>MICHAEL ADOLPH,<br><br>    *Defendant/Counter-Plaintiff.* | Case No. 1:12cv528 (TSE/IDD) |

**DR. ADOLPH'S MEMORANDUM IN OPPOSITION TO TOMTOM'S
MOTION FOR JUDGMENT ON THE PLEADINGS THAT
THE ASSERTED CLAIMS ARE INVALID UNDER 35 U.S.C. § 101**

William E. Copley VSB #43960
 wcopley@wmclaw.com
Peter J. Toren (admitted *pro hac vice*)
August J. Matteis, Jr. (admitted *pro hac vice*)
Sean J. Williams (admitted *pro hac vice*)
WEISBROD MATTEIS & COPLEY PLLC
1200 New Hampshire Ave., NW, Suite 600
Washington, DC 20036
Telephone: (202) 499-7901
Facsimile: (202) 478-1795

Antigone G. Peyton VSB #48472
 antigone.peyton@cloudigylaw.com
Clyde E. Findley VSB #48277
 clyde.findley@cloudigylaw.com
CLOUDIGY LAW PLLC
8300 Greensboro Drive, Suite 1250
McLean, VA 22102
Telephone: (703) 436-2033
Facsimile: (703) 436-2268

Date: August 17, 2015

*Counsel for Dr. Michael Adolph*

**TABLE OF CONTENTS**

I.     INTRODUCTION ....................................................................................................1

II.    PROCEDURAL HISTORY ....................................................................................4

III.   LEGAL STANDARDS ...........................................................................................5

     A.      PATENTS ARE INVALIDATED ONLY UPON A SHOWING OF CLEAR AND CONVINCING EVIDENCE OF INVALIDITY ....................................................5

     B.      THIS COURT SHOULD DENY A TARDY RULE 12(C) MOTION ................................6

IV.   ARGUMENT.........................................................................................................6

     A.      TOMTOM HAS NOT SATISFIED RULE 12(C).............................................................6

         1.      TomTom Did Not Request Leave and Has Not Shown Good Cause for Its Delay in Bringing This Motion ........................................6

         2.      The *Alice* Decision Did Not Change the Section 101 Patent Eligibility Analysis ........................................................................7

         3.      TomTom's Serial Motions Litigation Strategy Should Not Be Rewarded ........................................................................8

     B.      THE ASSERTED CLAIMS OF THE ADOLPH PATENT ARE DIRECTED TO PATENTABLE SUBJECT MATTER ........................................................9

         1.      The Adolph Patent Describes a Specific, Concrete and Tangible Method of Recording, Storing, and Continuously Updating Location Data in a Mobile Unit ........................................9

         2.      Determining Subject Matter Eligibility Is a Two-Step Process..............15

         3.      Claims Directed to Technological Solutions Are Patentable..................16

         4.      Adolph's Asserted Patent Claims Are Directed to Patentable Subject Matter ........................................................................18

V.     CONCLUSION.....................................................................................................26

# TABLE OF AUTHORITIES

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014) ........................................ passim

*Ameritox, Ltd. v. Millennium Health, LLC*, 2015 U.S. Dist. LEXIS 19665
(W.D. Wis., Feb. 19, 2015) .........................................................................................17

*AutoForm Eng'g GmbH v. Eng'g Tech. Assocs.*, 2014 WL 4385855 (E.D.
Mich. Sept. 5, 2014) .....................................................................................................5

*Bancorp Services, L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687
F.3d 1266 (Fed. Cir. 2012) ............................................................................................3

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................................6

*Bilski v. Kappos*, 561 U.S. 593 (2010) ................................................................................3

*buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350 (Fed. Cir. 2014) ........................................3

*Cal. Inst. of Tech. v. Hughes Commc'ns, Inc.*, 59 F. Supp. 3d 974 (C.D.
Cal. 2014) ...........................................................................................................4, 17, 21

*CertusView Techs., LLC v. S & N Locating Servs., LLC,* 2015 U.S. Dist.
LEXIS 7126 (E.D. Va. Jan. 21, 2015) ...........................................................................5

*Chamberlain Grp., Inc. v. Linear LLC*, 2015 WL 4111456 (N.D. Ill. Jul. 7,
2015) ............................................................................................................................19

*CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366 (Fed. Cir.
2011) ..............................................................................................................................3

*Data Distrib. Techs., LLC v. Brer Affiliates, Inc.*, 2014 U.S. Dist. LEXIS
115543 (D.N.J. Aug. 19, 2014) ......................................................................................5

*Diamond v. Diehr*, 450 U.S. 175 (1981) .....................................................................16, 25

*Drager v. PLIVA USA, Inc.*, 741 F.3d 470 (4th Cir. 2014) .................................................6

*France Telecom S.A. v. Marvell Semiconductor Inc.*, 2015 WL 925892
(N.D. Cal. Mar. 2, 2015) ...............................................................................................4

*In re Comiskey*, 499 F.3d 1365 (Fed. Cir. 2007), *revised*, 554 F.3d 967
(Fed. Cir. 2009) ............................................................................................................10

*In re Musgrave*, 431 F.2d 882 (CCPA 1970) ...................................................................20

*Intellectual Ventures I LLC v. Cap. One Fin. Corp.*, 2015 U.S. Dist.
LEXIS 62601 (D. Md. May 12, 2015) .....................................................................17, 18

*Modern Telecom Sys. LLC v. Juno Online Services, Inc.*, 2015 WL
1240182 (C.D. Mar. 17, 2015) ....................................................................................17

*Nystrom v. Trex Co.*, 424 F.3d 1136 (Fed. Cir. 2005) ........................................................5

*Protostorm, LLC v. Antonelli, Terry, Stout & Kraus, LLP*, 2015 U.S. Dist.
LEXIS 73486 (E.D.N.Y. June 5, 2015) ..........................................................................8

*Sea-Land Services, Inc. v. D.I.C., Inc.*, 102 F.R.D. 252 (S.D. Tex. 1984) ...................................7

*SiRF Tec., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319 (Fed. Cir. 2010).........................17, 20, 24

*Smartflash LLC v. Apple Inc.*, 2015 WL 661174 (E.D. Tex. Feb. 13, 2015) ..............................17

*TomTom, Inc. v. Adolph*, 2015 U.S. App. LEXIS 10328 (Fed. Cir. June 19, 2015) ...................................................................................................................................9, 11

*Trading Techs. Int'l, Inc. v. CQG, Inc*, 2015 WL 774655 (N.D. Ill. Feb. 24, 2015) ....................................................................................................................................5

*Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014)..................................................3

*United States v. Hall*, 664 F.3d 456 (4th Cir. 2012) .....................................................................5

*Wavetronix LLC v. Iteris, Inc.* 2015 WL 300726 (W.D. Tex. Jan. 22, 2015)...............................4

**Statutes**

35 U.S.C. § 101 ...................................................................................................................1, 7, 18

35 U.S.C. § 282 ...............................................................................................................................5

**Rules**

Fed. R. Civ. P. 12(c) ......................................................................................................................6

Fed. R. Civ. P. 16(b) ...................................................................................................................6, 7

**Treatises**

Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure (2014) ..................................................................................................6

## I.      INTRODUCTION

It is true that "laws of nature, natural phenomena, and abstract ideas" are not patent-eligible concepts.[1] But that general statement has no applicability here. Dr. Adolph's patent is directed to concrete, specific methods that implement data generation and storage activities involving specific travel data that are described and characterized, in detail, in claim 1 and the asserted dependent claims (claims 11 and 22-24). This claimed invention is inextricably intertwined with the destination tracking system components that reside in the body of the asserted claims. TomTom's belated Rule 12(c) motion for judgment on the pleadings seeking to invalidate Adolph's U.S. Patent No. 6,356,836 ("the '836 patent") under 35 U.S.C. § 101, on the grounds that the asserted claims are directed to a patent-ineligible abstract idea, should be denied.

TomTom's motion asserts that the Adolph invention is little more than a series of abstract steps: "recording points traveled, dropping intermediate points along straight lines of travel, and storing the remaining points."[2] The fact that claim 1 of the '836 patent *does not* describe a purely abstract idea can be illustrated by describing how it might be re-written if it did attempt to claim such abstract concepts:

> 1. A method for generating and updating data comprising:
>
> generating and storing traveled distance data;
>
> generating and storing section data from the traveled distance data
> by choosing those points that are most characteristic; and
>
> generating a section data file from the section data.

---

[1] TomTom's Br. (ECF No. 250) at 6.
[2] TomTom's Br. (ECF No. 250) at 1.

Unsurprisingly, this is exactly how TomTom describes the Adolph invention.[3] Yet in characterizing the invention as one directed towards generic data generation and storage activities, TomTom ignores the details residing in the claims that are important to the analysis of the patentability inquiry. Tellingly, when TomTom describes the subject matter of the Adolph patent, it relies primarily on specification citations relating to the purpose or objective the invention, not to the asserted claims.[4]

In contrast, the real claim 1, which TomTom ignores, states:

> 1. A method for generating and updating data for use in a destination tracking system of at least one mobile unit comprising:
>
> generating and storing traveled distance data in at least one storage device provided in said mobile unit **at least at predetermined time intervals**, wherein the traveled distance data represent traveled sections by at least a **series of nodes $P_i$** and **to each node $P_i$ geographical coordinates $x_i$ and $y_i$ are assigned**;
>
> generating and storing section data in the storage device provided in the mobile unit, said section data being generated by **selecting, from the traveled distance data, nodes $P_j$ and $P_k$, which define contiguous sections $P_jP_k$, to which at least their geographical starting point and end point are assigned**; and
>
> generating a section data file from the section data and storing the section data file in the storage device provided **in the mobile unit** said section data file being **continuously supplemented and/or updated** with section data **newly generated by the mobile unit**.[5]

The terms indicated in **bold underlined text** represent specific concrete details relating to exactly *what* data is recorded, *how* and *when* that data is recorded, *how* specific values in that data are extracted and processed and the concrete characteristics of that data, and *how* those

---

[3] *See* TomTom Br. (ECF No. 250) at 10 (citing excerpts of the specification *and not the claims* to characterize the invention as having "no particular concrete or tangible form" and corresponding to "nothing more than a 'scheme or concept' for storing and organizing trip data").

[4] *See* TomTom Br. (ECF No. 250) at 10.

[5] '836 patent at col. 17, ll. 34-55.

values are saved and continuously updated. These details describe a particular computing solution that overcomes a problem specifically arising in the realm of digital map construction that is implemented in a destination tracking system. It is not directed towards an abstract idea drawn to "a method of organizing human activity."[6] Nor does it reference an abstract algorithm or natural law relating to gathering and storing data, and then say "apply it." In short, Dr. Adolph's invention is not a business method or financial process of the kind found unpatentable under *Alice*,[7] *Bilski*,[8] *buySAFE*,[9] *Bancorp*,[10] *Cybersource*,[11] *Ultramercial*,[12] and the like.

Adolph claims the generation and storage of specific travel data in a particular concrete or tangible form, with specific characteristics found in the limitations of asserted claims 1, 11, and 22-24. As described in greater detail below, Adolph's patent is a technological invention that generates and stores geographic location data and traffic data that are used to make digital maps and predict traffic congestion. The asserted claims are directed to an invention that solves a specific, real world, technological problem concerning the way digital maps were made and the way traffic data was collected in the 1990s. Such claims "should generally be patentable, even if

---

[6] *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2356-57 (2014).

[7] *Id.* (finding claims directed to an *intermediated settlement invention* were unpatentable, even though some of the claims required generic computer implementation).

[8] *Bilski v. Kappos*, 561 U.S. 593 (2010) (finding claims directed to a *risk hedging invention* were unpatentable).

[9] *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350 (Fed. Cir. 2014) (finding claims directed to creating a *transaction performance guaranty* were unpatentable despite the recitation of a computer that received and sent information over a network).

[10] *Bancorp Services, L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266 (Fed. Cir. 2012) (finding claims directed to *managing a stable value life insurance policy* were unpatentable).

[11] *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366 (Fed. Cir. 2011) (finding claims directed to *verifying the validity of credit card transactions over the Internet* were unpatentable).

[12] *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014) (finding claims directed to *using an advertisement as an exchange or currency* were unpatentable even though the claims were tied to a general purpose computer and invoked the Internet).

their novel elements are mathematical algorithms."[13] Therefore, Dr. Adolph's asserted claims are directed to patentable subject matter and TomTom's motion for judgment on the pleadings should be denied.

## II.     PROCEDURAL HISTORY

This is the *third* time TomTom has burdened this Court with a hasty motion for summary judgment or the equivalent. The first time, without waiting for the Court to hold a claim construction hearing, TomTom sought summary judgment of noninfringement on the theory that it practices limitations of the '836 patent outside of the United States.[14] At the conclusion of the motion hearing on February 22, 2013, the Court summarily denied TomTom's motion from the bench.[15] Then, less than two weeks after the Court issued its claim construction order on February 25, 2014, TomTom anxiously filed a second motion for summary judgment seeking a judgment of non-infringement.[16] As detailed in Dr. Adolph's recent Motion to Strike, neither motion for summary judgment asserted that the Adolph patent claims are invalid because they are directed to non-patentable subject matter.[17]

---

[13] *Cal. Inst. of Tech. v. Hughes Commc'ns, Inc.*, 59 F. Supp. 3d 974, 993 (C.D. Cal. 2014) ("When claims provide a specific computing solution for a computing problem, these claims should generally be patentable, even if their novel elements are mathematical algorithms."); *see also France Telecom S.A. v. Marvell Semiconductor Inc.*, 2015 WL 925892, at *11 (N.D. Cal. Mar. 2, 2015) (rejecting argument that claim that incorporated mathematical algorithm did not recite patent-eligible subject matter); *Wavetronix LLC v. Iteris, Inc.* 2015 WL 300726, at *1, 6 (W.D. Tex. Jan. 22, 2015) ("Merely employing a mathematical formula does not render a claimed method unpatentable where the method improves upon an existing technological process.").

[14] TomTom's 1st Mot. for Summ. J., ECF No. 130.

[15] Minute Entry. ECF No. 169.

[16] TomTom's 2nd Mot. for Summ. J. ECF No. 200.

[17] Adolph's Mot. to Strike, ECF No. 255; Mem. in Support, ECF No. 257.

### III. LEGAL STANDARDS

#### A. Patents Are Invalidated Only Upon a Showing of Clear and Convincing Evidence of Invalidity

Section 282 of the Patent Act explicitly states that patents issued by the United States Patent and Trademark Office must be presumed valid.[18] It is also well established that a party seeking to overcome that presumption of validity must do so by showing clear and convincing evidence that an issued patent is actually invalid.[19] "[C]lear and convincing has been defined as evidence of such weight that it produces in the mind of the trier of fact a belief or conviction, without hesitancy, as to the truth of the allegations sought to be established, and, as well, as evidence that proves the facts at issue to be highly probable."[20] The same standard applies when the issue is resolved as a question of law under the clear and convincing standard. Thus, TomTom cannot prevail on the merits of its tardy Section 101 challenge unless it shows by clear and convincing evidence that all of the asserted claims of the '836 patent are directed to patent-ineligible subject matter.[21] It cannot do so.

---

[18] 35 U.S.C. § 282.

[19] *See Nystrom v. Trex Co.*, 424 F.3d 1136, 1149 (Fed. Cir. 2005).

[20] *United States v. Hall*, 664 F.3d 456, 461-62 (4th Cir. 2012) (alteration in original, internal citation omitted).

[21] *See, e.g., CertusView Techs., LLC v. S & N Locating Servs., LLC,* 2015 U.S. Dist. LEXIS 7126, *42 n.6 (E.D. Va. Jan. 21, 2015) ("[T]he Court is duty-bound to apply the law as enacted by Congress and signed by the President, and in light of the Federal Circuit's interpretation thereof. … Defendants must show, by clear and convincing evidence, that the patents-in-suit claim patent-ineligible subject matter."); *Trading Techs. Int'l, Inc. v. CQG, Inc*, 2015 WL 774655 (N.D. Ill. Feb. 24, 2015) (same); *Data Distrib. Techs., LLC v. Brer Affiliates, Inc.*, 2014 U.S. Dist. LEXIS 115543, at *23 (D.N.J. Aug. 19, 2014) (stressing in Section 101 analysis that "Congress has mandated that '[a] patent shall be presumed valid . . .' A party seeking to establish that particular claims are invalid must overcome the presumption of validity . . . by clear and convincing evidence."); *AutoForm Eng'g GmbH v. Eng'g Tech. Assocs.*, 2014 WL 4385855, at *3 (E.D. Mich. Sept. 5, 2014) ("Defendant has failed to overcome the presumption of patentability [under 101] with clear and convincing evidence.").

### B. This Court Should Deny a Tardy Rule 12(c) Motion

To assist in the speedy and efficient resolution of cases, Rule 16(b) requires a court to enter a scheduling order that limits the time litigants may file motions. Once set, the scheduling order may only be modified by leave of court upon a showing of good cause.[22] Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay the trial—a party may move for judgment on the pleadings."[23] The question of whether a Rule 12(c) motion would delay a trial is within the sound discretion of the Court.[24] "A Rule 12(c) motion tests only the sufficiency of the complaint and does not resolve the merits of the plaintiff's claims or any disputes of fact."[25] All doubt should be resolved in the non-movant's favor.[26]

## IV. ARGUMENT

### A. TomTom Has Not Satisfied Rule 12(c)

#### 1. TomTom Did Not Request Leave and Has Not Shown Good Cause for Its Delay in Bringing This Motion

This Court's scheduling order unambiguously required that all dispositive motions were to be filed by February 15, 2013.[27] TomTom has not requested leave from the Court to file a third "dispositive" motion. In addition, TomTom has completely failed to meet Rule 16's "good

---

[22] Fed. R. Civ. P. 16(b).

[23] Fed. R. Civ. P. 12(c).

[24] Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1367 (2014).

[25] *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014).

[26] *See, e.g.*, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[27] *See* Rule 16(b) Scheduling Order (ECF No. 43) ¶ 1 (setting Jan. 11, 2013 as the close of discovery), ¶ 3 (approving the parties' Amended Joint Proposed Discovery Plan), ¶ 11 ("All Fed. R. Civ. P. 12 issues shall be raised in one pleading unless leave of court is first obtained. All summary judgment issues shall be presented in the same pleading unless leave of court is first obtained."); *see also* Amended Joint Proposed Discovery Plan (ECF No. 42) ¶ VIII (setting Feb. 15, 2013 for submission of dispositive motions), ¶ IX (setting Jan. 17, 2013 for the pretrial conference).

cause" standard—it has not provided a persuasive reason why the scheduling order deadline for the filing of dispositive motions (which TomTom agreed to) could not "reasonably be met despite the diligence of the party seeking the extension."[28] TomTom has failed to offer any meaningful reason why it could not have filed its Rule 12(c) motion before February 15, 2013 (the date when dispositive motions were due), therefore its motion may be denied on procedural grounds alone.

### 2. The *Alice* Decision Did Not Change the Section 101 Patent Eligibility Analysis

TomTom implicitly defends its untimely motion by suggesting that *Alice* changed the standard of patentability under 35 U.S.C. § 101. That is not the case. Indeed, the language of *Alice* confirms that its holding was in line with existing precedent and did not represent a change in the Supreme Court's or the Federal Circuit's pre-existing § 101 jurisprudence.[29] Even TomTom's opening brief concedes that its § 101 challenge was ripe for consideration under pre-*Alice* Federal Circuit precedent:

> Indeed, even before *Alice*, the Federal Circuit held patents that claim manipulating data to be patent-ineligible. In *Accenture*, a patent claiming "transmitting information," "determining characteristics of the information," "applying characteristics of the information" through "a plurality of levels," "storing the updated information," and "generating a historical record" to aid processing insurance records was held invalid. 728 F.3d at 1339. The Federal Circuit explained the claims were patent-ineligible because they merely recited "generalized software components arranged to implement an

---

[28] Fed. R. Civ. P. 16(b) advisory committee's note (1983); *see also Sea-Land Services, Inc. v. D.I.C., Inc.*, 102 F.R.D. 252, 253–54 (S.D. Tex. 1984) (denying defendant's Rule 12(c) motion filed seven months after motion cut-off date because "[t]he Defendant offers the court no explanation or showing of 'good cause' why on the eve of trial the motion should be considered").

[29] *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2350 (June 19, 2014) (re-affirming *Bilski* and other prior decisions and concluding that "[i]t follows from our prior cases, and *Bilski* in particular, that the claims at issue here are directed to an abstract idea.").

abstract concept on a computer." *Id.* at 1345. Similarly, in *CyberSource*, claims directed to a "method for verifying the validity of credit card transaction over the Internet" were held invalid because "even if some physical steps are required to obtain information from the database (e.g., entering a query via a keyboard, clicking a mouse), such data-gathering steps cannot alone confer patentability." 654 F.3d at 1370, 1372.[30]

Thus, TomTom's assertion that it could not have brought a § 101 motion before the Supreme Court *Alice* decision is wholly disingenuous.

And, since *Bilski* and *Mayo* were Supreme Court decisions relating to patentability that issued in 2010 and 2012, respectively, TomTom has no excuse for why it could not have raised § 101 motion in a timely fashion as required by the scheduling order.[31]

### 3. TomTom's Serial Motions Litigation Strategy Should Not Be Rewarded

Instead of pursuing a patentability challenge under § 101, TomTom elected to file two unsuccessful motions for summary judgment claiming non-infringement. Only now, after these unsuccessful efforts, including losing a claim construction battle at the Federal Circuit, does TomTom assert that the entire case can be disposed of because the asserted claims of the '836 patent are directed to unpatentable subject matter. This Court should deny TomTom's transparent attempt to delay trial through serial motions practice. Were the Court to permit TomTom to file a Rule 12(c) patentability motion, after the close of discovery and after it lost two summary judgment motions that could have included the same invalidity argument covered

---

[30] TomTom Br. (ECF No. 250) at 12. TomTom's cited cases were decided as early as 2011.

[31] Discovery closed in this case on January 11, 2013. Rule 16(b) Scheduling Order (ECF No. 43) at 1 (¶ 1). *See also Protostorm, LLC v. Antonelli, Terry, Stout & Kraus, LLP*, 2015 U.S. Dist. LEXIS 73486, *26-27 (E.D.N.Y. June 5, 2015) ("Alice did not, as [defendant] would have this Court believe, announce a previously-unknown framework for analyzing patent eligibility under Section 101").

in the 12(c) motion, it would encourage other similarly-situated parties to hold back on the patentability/invalidity issue and file a 12(c) motion on it before trial.

### B. The Asserted Claims of the Adolph Patent Are Directed to Patentable Subject Matter

#### 1. The Adolph Patent Describes a Specific, Concrete, and Tangible Method of Recording, Storing, and Continuously Updating Location Data in a Mobile Unit

TomTom never discusses the detail found in claims 1, 11, and 22-24 of the Adolph patent in its motion. That's because the claim language recites the concrete details—the patentable teachings as to how the generating, storing, recording, and continuously updating actions are implemented in the invention and the specific characteristics reflected in that data as it is stored in a mobile unit of the destination tracking system. Try as it might, TomTom cannot change the fact that the patentable subject matter analysis must be tethered to the claimed invention.

As the Federal Circuit noted, Dr. Adolph's patent describes "'[a] method and device for generating, merging and updating data' that can then be used to provide a mobile unit with current, and continuously updated, accurate road network, route, and traffic information."[32] The Federal Circuit also observed that one purpose of the invention was "to establish a method to generate appropriate data utilizable for a practical destination tracking system which carries out a permanent self updating and with data generation which requires little effort."[33] "In other words," according to the Federal Circuit, "as the mobile unit (*e.g.*, an automobile) travels, its location is determined at set time intervals and it generates and stores the data measured at each

---

[32] *TomTom, Inc. v. Adolph*, 2015 U.S. App. LEXIS 10328, *1-2 (Fed. Cir. June 19, 2015) (citing the '836 patent at Abstract, col. 4 ll. 52–65).

[33] *Id*. at *2 (citing the '836 patent at col. 3 ll. 38–44).

node."[34] "The location's x and y coordinates (for example, longitude and latitude), acquired using the Global Positioning System ('GPS'), are then assigned to that node.[35] Once location data (called "traveled distance data") has been collected, "[t]he second [limitation] of claim 1 involves generating and storing 'section data,' which is generated from 'traveled distance data' by selecting nodes that form contiguous segments of road."[36] "The section data file is updated with new section data as the 'mobile unit' continues traveling and generating new section data."[37] The body of claim 1 captures these core features of the invention and describes with specificity the characteristics of the information generated and stored in each step.

Tellingly, the Federal Circuit did not express any Section 101 concerns about the '836 patent, even though that court has not hesitated to raise such concerns, *sua sponte*, in the past.[38]

The first limitation of the claimed method involves generating and storing "traveled distance data." As illustrated in Figure 1 below,[39] claim 1 describes "traveled distance data" as data having at least a series of nodes $P_i$ (indicated in Figure 1 as $P_1$, $P_2$, $P_3$, $P_4$, and $P_5$). As a mobile unit travels, it determines its location on the globe at predetermined time intervals (such as every second), and generates and stores that location data in a storage device provided in the mobile unit. Each traveled distance data measurement corresponds to a "node," which the

---

[34] *Id*. at *3 (citing the '836 patent at col. 3 ll. 52–65).

[35] *Id*. (citing the '836 patent at col. 3 l. 66–col. 4 l. 1).

[36] *Id*. (citing '836 patent at col. 17 ll. 45–50).

[37] *Id*.

[38] *See, e.g.*, *In re Comiskey*, 499 F.3d 1365 (Fed. Cir. 2007), *revised*, 554 F.3d 967 (Fed. Cir. 2009) (considering Section 101 issues *sua sponte* and finding certain claims describing a method of conducting arbitration were not proper subject matter under Section 101).

[39] These figures were provided to the Court in Adolph's Response to TomTom's Opening Claim Construction Brief (ECF No. 174). They were also provided to the Federal Circuit in Adolph's Opening Brief on Appeal.

Federal Circuit construed as a geographic location.[40] Importantly, geographic coordinates $x_i$ and $y_i$ recorded for each location are assigned to their corresponding node $P_i$.[41]



**Figure 1**

Even at this early stage of the method claim analysis, the detailed language of claim 1's first limitation stands in marked contrast with the abstract, general, and conceptual claim language that courts considering other patents have held unpatentable. The claims-at-issue in *Alice*, for example, describe *what* the invention does, but include nothing about *how* the various steps are performed. The first step of the *Alice* claim is devoid of detail regarding how the various concepts are to be implemented, in practice:

> creating a shadow credit record and a shadow debit record for each stakeholder party to be held independently by a supervisory institution from the exchange institutions[42]

Thus, while the *Alice* claim describes creating a shadow credit record and a shadow debit record, it includes no instructions about how that limitation is to be performed or what data is involved. The data structure of a credit record and the data structure of a debit record, as well as how those data structures are to be created, and what information they contain, are left to the

---

[40] *TomTom, Inc. v. Adolph*, 2015 U.S. App. LEXIS 10328, *22 (Fed. Cir. June 19, 2015).

[41] *E.g.,* '836 patent at col. 3, l. 66; col. 5, ll. 17–23; col. 5, ll. 51–55; col. 9, ll. 51–54.

[42] *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2352 n. 2 (2014).

imagination of the reader. The next instruction in the *Alice* claim is even more conceptual in nature. It essentially requires the two records "to be held independently by a supervisory institution from the exchange institutions." Again, nothing in that instruction indicates how it is to be implemented in practice. Thus, the *Alice* claim fails to demonstrate an inventive teaching of the concept because it does not contain any elements, or combination of elements, that are sufficient to ensure that the invention amounts to something significantly more than an abstract idea.[43]

In contrast, the first limitation of Dr. Adolph's claim 1 is steeped in concrete details:

> generating and storing traveled distance data in at least one storage device provided in said mobile unit **at least at predetermined time intervals**, wherein the traveled distance data represent traveled sections by at least a **series of nodes $P_i$** and **to each node $P_i$ geographical coordinates $x_i$ and $y_i$ are assigned**

That is, after reading Dr. Adolph's claim language, one of ordinary skill in the art obtains an understanding of the content of each claim limitation from information found in that claim, and the specification, which describe *how* the method claim is performed and the specific characteristics of "traveled distance data" that satisfies that limitation. Specific values (nodes $P_i$) are identified. The claim even specifies individual components ($x_i$ and $y_i$) of the node values, as well as the relationship of those components to the values. There is no concern here about lack of detail or lack of specificity about how to implement the invention. Moreover, the data generated and stored in the first limitation found in the body of Claim 1 are specific geographic location (node $P_i$) data, obtained at specific predetermined time intervals, with specific individual

---

[43] *Alice*, 134 S. Ct. at 2359 ("[T]he relevant question is whether the claims here do more than simply instruct the practitioner to implement the abstract idea of intermediated settlement on a generic computer. They do not.").

components ($x_i$ and $y_i$). They are gathered and stored for the purpose of creating a digital map and/or traffic information for use in a destination tracking system of at least one mobile unit.

The second limitation of claim 1 involves generating and storing "section data" by selecting certain traveled distance data that meets specific, concrete, and claimed criteria:

> generating and storing section data in the storage device provided in the mobile unit, said section data being generated by **selecting, from the traveled distance data, nodes $P_j$ and $P_k$, which define contiguous sections $P_jP_k$, to which at least their geographical starting point and end point are assigned**; and

As illustrated in Figure 2 below, "section data" are generated from "traveled distance data" by selecting nodes $P_j$ and $P_k$ that form the end points of a section (*i.e.*, a contiguous segment of a traveled road). As the specification explains, a section may include more than two nodes.[44] So, in Figure 2, for example, $P_1P_2$ and $P_2P_5$ are examples of sections or "section data."



**Figure 2**

The second limitation of claim 1 further requires nodes $P_j$ and $P_k$ to be selected to form section data in a manner such that each section represents a *contiguous* section of travel $P_jP_k$. Thus, if a GPS signal is lost, for example, several "bad" traveled distance data points could be generated that are not accurate and not contiguous with previously generated data. These "bad" data points should not become section data, not only because they are inaccurate, but also

---

[44] '836 patent at col. 10, ll. 25–29.

because they do not represent a contiguous section of travel. Figure 3 illustrates this not-uncommon situation:



**Figure 3**

The second limitation of claim 1 also provides detailed instructions describing *how* section data is to be created from traveled distance data and identifies certain characteristics of data that is considered section data meeting the claim's requirements.

The third limitation of method claim 1 involves generating, storing, and updating a "section data file":

> generating a section data file from the section data and storing the section data file in the storage device provided **in the mobile unit** said section data file being **continuously supplemented and/or updated** with section data **newly generated by the mobile unit**.

To write data to a file, data must be converted to some binary format. Figure 4 illustrates this operation:



**Figure 4**

Additionally, as stated in claim 1, the section data file is *continuously supplemented and/or updated* with new section data as the mobile unit continues to travel and generate new section data from traveled distance data. This is not an activity performed by a person in their head, or on a sheet of paper, that has simply been applied to computer technologies or generic hardware.

### 2. Determining Subject Matter Eligibility Is a Two-Step Process

The Supreme Court has established a two-step analytical framework to determine patent eligibility under § 101, the goal of which is to distinguish patents that claim patent-ineligible laws of nature, natural phenomena, and abstract ideas from claims that describe patent-eligible applications of those concepts.[45] First, the claims are examined to determine whether they are directed to a patent-ineligible abstract idea.[46] If so, the elements of each claim—both individually and as an ordered combination—must then be examined to determine whether the additional elements transform the nature of the claim into a patent-eligible *application* of that

---

[45] *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1294 (2012).
[46] *Alice*, 134 S. Ct. at 2355 (citing *Mayo*, 132 S. Ct. at 1289).

abstract idea.[47] The purpose of the second step is to ensure that a claim does not preempt all uses of the idea.[48] That is, the claim must provide some "practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself."[49]

### 3. Claims Directed to Technological Solutions Are Patentable

The Supreme Court and the Federal Circuit have both provided guidance, in a number of decisions, on how to determine which computer-implemented inventions are patent eligible. As an initial matter, although abstract ideas, by themselves, are excluded from protection under Section 101,[50] the Supreme Court has recognized that "too broad an interpretation of this exclusionary principle could eviscerate patent law; [f]or all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas."[51] Consequently, both the Supreme Court and the Federal Circuit have found certain inventions patentable, even when they recite an abstract idea. For example, in *Diamond v. Diehr*, the Supreme Court held that an algorithm that calculated the proper time to open a molding press and remove a cured rubber product was patentable because the algorithm constantly measured the physical temperature inside the mold and issued a signal to open the press at the proper time.[52] The key to patentability was the fact that the algorithm was connected to a physical process via a temperature measurement, even though the algorithm did not control the molding

---

[47] *Id.* (emphasis added).

[48] *Alice*, 134 S. Ct. at 2355 ("This conclusion accords with the pre-emption concern that undergirds our § 101 jurisprudence.") (citing *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289 (2012)).

[49] *Mayo*, 132 S. Ct. at 1297.

[50] *Diamond v. Diehr*, 450 U.S. 175, 185 (1981) ("Excluded from such patent protection [under Section 101] are laws of nature, natural phenomena, and abstract ideas.").

[51] *Mayo*, 132 S. Ct. at 1293.

[52] *Diehr*, 450 U.S. at 175.

press. Similarly, in *DDR Holdings, LLC v. Hotels.com, L.P.*, the Federal Circuit held that an invention that used software to make one Internet website look like another was patentable because the claimed invention recited a solution that was "rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks."[53] Again, the claim was connected to a physical (albeit electronic) process, this time via a network. Similarly—and importantly for the purpose of analyzing the Adolph invention, the Federal Circuit has also held that an algorithm to calculate an absolute geographic location of a GPS receiver is patent-eligible under § 101 because the "GPS receiver is a machine and is integral to each of the claims at issue."[54] These and other cases supplied in Appendix A demonstrate that even claims directed to abstract subject matter can be patentable if they solve a technological problem (as opposed to merely providing a business method) or if they are integral to a physical machine or process.[55]

---

[53] *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014).

[54] *SiRF Tec., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1332-33 (Fed. Cir. 2010).

[55] *See, e.g.*, *Cal. Inst. of Tech. v. Hughes Commc'ns. Inc.*, 59 F. Supp. 3d 974, 995 (C.D. Cal. 2014) (stressing that claim was patent-eligible because, among other things, it "create[d] an algorithmic solution for a computing problem – the corruption of data during transmission"); *Modern Telecom Sys. LLC v. Juno Online Services, Inc.*, 2015 WL 1240182, at *8 (C.D. Mar. 17, 2015) (patents describing "solution that is 'necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks" held patent eligible); *Smartflash LLC v. Apple Inc.*, 2015 WL 661174, at *1, 8 (E.D. Tex. Feb. 13, 2015) (claims that claims recited "specific ways of using distinct[, among other things,] . . . data types" patent eligible because they "amount[ed] to significantly more than" an underlying abstract idea); *Ameritox, Ltd. v. Millennium Health, LLC*, 2015 U.S. Dist. LEXIS 19665, at *67 (W.D. Wis., Feb. 19, 2015) (even if claim recited abstract idea, it was still patentable because it "solved a unique problem with respect to drug testing technology."); *Intellectual Ventures I LLC v. Capl. One Fin. Corp.*, 2015 U.S. Dist. LEXIS 62601 (D. Md. May 12, 2015) (claimed system and method for dynamically retrieving, manipulating, updating, creating, and displaying data from sources of [XML] documents patent-eligible because it "solve[d] a unique problem in computer technology … .").

### 4. Adolph's Asserted Patent Claims Are Directed to Patentable Subject Matter

TomTom's characterization of the Adolph invention does *not* match the claims and, actually, TomTom ignores the claim language entirely.[56] Instead, TomTom summarizes the Adolph invention as claiming "the abstract idea of recording a route taken from point A to B[,] [r]ecording the data points in a route and then compressing that data down to the characteristic points of the route."[57] In support of its summary, TomTom highlights generalized descriptions of the Adolph invention found in the '836 patent *specification* (not the claims), and spends at least three pages exploring various Federal Circuit and district court cases that have invalidated claims on subject matter grounds, *without even once applying or attempting to explain how those cases are analogous to Dr. Adoph's claims*. Such a lack of analysis falls well short of TomTom's burden to provide clear and convincing evidence that the '836 patent is invalid under 35 U.S.C. § 101, let alone any other applicable standard governing a Rule 12(c) motion.[58]

In the early 1990s, Dr. Adolph experimented with geolocation systems and discovered that accurate digital maps, as well as accurate real-time traffic information, could be created by collecting and merging time-location data from many different trips and then identifying and eliminating erroneous "outlier" data. Dr. Adolph solved the problem of creating accurate digital

---

[56] TomTom Br. (ECF No. 250) at 10-13 (Section IV.A. "The Patent Claims the Abstract Idea of Recording Trip Data").

[57] TomTom Br. (ECF No. 250) at 10.

[58] "[T]he important inquiry for a § 101 analysis is to look at the claim[s]." *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013); *see also Intellectual Ventures I LLC v. Cap. One Fin. Corp.*, 2015 U.S. Dist. LEXIS 62601, *26-27 (D. Md. May 12, 2015) (Spec. Master. Rep.) (rejecting defendant's argument that patent claim was abstract concept analogous to concepts of "data storage" or activities performed by "human translator" under *Alice* step 1 because defendant's characterization was "excessively detached from the specificity and plain language of the claimed invention, and the overall intrinsic evidence pertaining to the patent").

map and traffic data by disclosing, for the first time, a new approach to generating, merging, and updating location and travel information using mobile devices. His approach to travel data collection for future use in map-making and traffic prediction provided at least two important benefits: (1) it allowed a user to create a digital map from scratch automatically while traveling, and to update existing digital maps to extend a known road network and/or to correct errors in that network; and (2) it enabled collection of digital traffic data from a large number of users that could be combined to form an accurate picture of traffic patterns and current digital road networks.[59] Dr. Adolph's invention is not about plotting travel points on existing maps or charts. It also does not claim the use of age-old navigation techniques to keep track of headings. The Adolph invention describes a new way of creating and updating digital maps and traffic information from actual data obtained from GPS systems, automatically.

### a. Adolph's Claims Are Not Abstract, Unpatentable Subject Matter

Following the Supreme Court's framework established in *Mayo*, an analysis of § 101 patentability issues begins with an examination of the claims to determine whether they are directed to an abstract idea. Unlike the claims at issue in cases like *Alice*, *Ultramercial*, *buySAFE*, *Accenture*, and *Bancorp*, all of which were found to be directed to abstract business methods, the claims in the '836 patent do not recite a fundamental economic or longstanding

---

[59] TomTom argues that plotting points is an abstract idea that predates GPS devices, in part because, for example, "[m]ariners have used compasses and sextants for chart plotting for centuries." TomTom Br. (ECF No. 250) at 1. This is misdirection. *See Chamberlain Grp., Inc. v. Linear LLC*, 2015 WL 4111456, at *7 (N.D. Ill. Jul. 7, 2015) (rejecting argument that movable-barrier invention was abstract even though defendant argued that "[o]pening and closing a 'movable barrier' . . . is as old as civilization. Houses, gates, castles, and city walls have had 'movable barriers' for as long as humans have built dwellings").

commercial practice. On the contrary, Dr. Adolph's claims are directed to solving a technological problem related to the creation of digital maps.[60]

Dr. Adoph's claimed invention stands apart from those found to be too abstract because they merely recite an abstract idea. Instead, claim 1 describes a particular solution to a technological problem that existed in the field of digital map creation and traffic information management in the late 1990s. Specifically, claim 1 describes *how* each claimed limitation is to be performed and specific characteristics of the traveled distance data, section data, and the section data file.

Specific data values (in the form of nodes $P_i$) are identified. Claim 1 even specifies individual components ($x_i$ and $y_i$) of the node values, as well as the relationship of those components to the values. Moreover, the geographic location (node $P_i$) data generated and stored in the first limitation of claim 1 as "traveled distance data" are obtained at specific predetermined time intervals, with specific individual components ($x_i$ and $y_i$), for the purpose of creating a digital map and/or traffic information for use in a destination tracking system of at least one mobile unit. In addition, the claimed invention is grounded in physical processes within a machine because the traveled distance data and extracted section data are stored in a physical storage unit within a physical mobile unit.[61] Finally, due to the fact that claim 1 requires traveled

---

[60] *Alice*, 134 S. Ct. at 2359-60 (citing *Diehr*, 450 U.S. at 177-178); *see also id.* at 2358 (explaining that the claims in *Diehr* were patent eligible because they disclosed an "improve[ment]" to a "technological process"). One of the Federal Circuit's predecessor courts likewise applied a technological arts test for patent eligibility. It recognized that patentable processes must "be in the technological arts so as to be in consonance with the Constitutional purpose to promote the progress of 'useful arts.'" *In re Musgrave*, 431 F.2d 882, 893 (CCPA 1970) (quoting U.S. Const. art. I, § 8, cl. 8).

[61] *SiRF Tec., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1332-33 (Fed. Cir. 2010) (finding a method for calculating an absolute position of a GPS receiver to be patent-eligible because the GPS receiver was a machine and was integral to each of the claims at issue).

distance data to be generated and stored at least at predetermined intervals and because the claim can optionally require a GPS receiver to perform the necessary (and difficult) geolocation calculations, this is not a process that can be performed by a human using a pencil and paper.[62] The Adolph invention, therefore, is not an abstract idea according to the first step of the *Mayo* patentability analysis. It is an invention that provides an improvement over prior technology in a concrete technical field.

### b. Adolph's Asserted Claims Are Directed to a Patent-Eligible Application

Even if the Court were to find that that Dr. Adolph's claims are directed to an abstract idea under the first step of the *Mayo* analysis (which they are not), the claims nevertheless are still patentable. Under the second step of the *Mayo* analysis, they are still patentable because they do not broadly and generically claim "generating and updating data."[63] Rather, claims 1, 11, and 22-24 specify *how* particular geographic location values are first generated by a mobile unit and then extracted, manipulated, and stored to yield a desired result: a result that enables travel data to be collected and used to create digital map data and digital traffic data automatically in a mobile unit. The claimed detail about *how* the invention works should not be overlooked and

---

[62] *Id*. at 1333 ("[T]here is no evidence here that the [GPS] calculations here can be performed entirely in the human mind."); *see also*, *Cal. Inst. of Tech. v. Hughes Commc'ns. Inc.*, 59 F. Supp. 3d 974, 994-95 (C.D. Cal. 2014) ("The Court finds this [mental steps] mode of analysis unhelpful for computer inventions. Many inventions could be theorized with pencil and paper, but pencil and paper can rarely produce the actual effect of the invention. Likewise, with regard to software, a human could spend months or years writing on paper the 1s and 0s comprising a computer program and applying the same algorithms as the program. At the end of the effort, he would be left with a lot of paper that obviously would not produce the same result as the software. The problems of pencil-and-paper analysis are heightened in the context of software, which necessarily uses algorithms to achieve its goals. Pencil-and-paper analysis can mislead courts into ignoring a key fact: although a computer performs the same math as a human, a human cannot always achieve the same results as a computer.").

[63] TomTom Br. (ECF No. 250) at 1, 14.

should not be summarized to give the false impression of an abstract idea that is not grounded in technical detail. Dr. Adolph's invention generates and stores collected data at *predetermined time intervals*, in the form of *nodes $P_i$*, to which geographic coordinates $x_i$ and $y_i$ are assigned.[64] The collected travel data is then processed to create section data by *selecting nodes $P_j$ and $P_k$ that form the end points of a section*. Nodes $P_j$ and $P_k$ are selected to make sure *each section represents a contiguous section of travel $P_jP_k$*. The individual sections are then *stored in a storage device in a mobile unit*, where the section data can be continuously *supplemented and/or updated* with new section data as the mobile unit continues to travel.

The specificity in claim 1 describing the *kind* of data collected (geographic locations), *how* the data are collected (at predetermined time intervals), and the characteristics of data (specific values) that are extracted and stored (by selecting nodes that define contiguous sections)—all underscores the fact that the claims do not preempt every application of generating and updating data. As a result, the claims in Dr. Adolph's patent include "additional features" that ensure the claims are "more than a drafting effort designed to monopolize the [abstract idea]."[65] Thus, the claimed solution amounts to an inventive concept for resolving a particular digital map creation problem, thereby rendering the claims patent-eligible.

### a.  *Adolph's Asserted Dependent Claims Contain Additional Patentable Detail*

Each of the asserted dependent claims depends, either directly or indirectly, from claim 1. Claims 11 and 22-24 include additional detail further supporting patentability.

Claim 11, for example, builds upon claim 1 by including the additional steps of transmitting section data files belonging to more than one mobile unit to a central computer and

---

[64] '836 patent at col. 17 ll. 35-55 (claim 1).

[65] *Mayo*, 132 S. Ct. at 1297 (2012).

merging the section data files together (at least at predetermined time intervals) into at least one overall route file:

> 11. The method according to claim 1, further comprising the steps of *transmitting the section data files of more than one mobile unit to at least one central computer* located in a location remote from said at least one mobile unit and having said central computer *merge said section data files at least at predetermined time intervals* into at least one overall route file.[66]

The transmitting and merging features of claim 11 underscore Dr. Adolph's goal of using many mobile units together to compile new digital map data, thus reinforcing the idea that Dr. Adolph's invention is not directed to a business method, but instead directed to solving a specific technological problem relating to the creation of digital maps and traffic prediction information. And the claimed method is not one that can be practiced in one's head or on a piece of paper.

Claim 22 explicitly recites an integrated technological solution for determining absolute coordinates of a mobile unit and demonstrates that the Adolph invention is inextricably intertwined with technology, not one that includes a generic recitation of computer systems and equipment that can be used to practice an abstract concept. Claim 22 builds upon claim 1 by requiring geographic locations to be determined from absolute coordinates received using a Global Positioning System:

> 22. The method according to claim 1, further comprising the step of determining *absolute coordinates* of the mobile unit *using the Global Positioning System*.[67]

The explicit addition of a GPS system to the claimed invention is, according to the Federal Circuit, enough to "place a meaningful limit on the scope of the claims" and thereby render the

---

[66] '836 patent at col. 18 ll. 35-41 (claim 11) (emphasis added).

[67] '836 patent at col. 19 ll. 22-24 (claim 22) (emphasis added).

claim patentable.[68] This result follows because "a GPS receiver is a machine and is integral to each of the claims at issue."[69] Moreover, the claim also refers to determining an "absolute position" of the mobile unit using the GPS system, which further integrates the GPS system into the claim and renders it patent-eligible.[70]

Claim 23 builds upon claim 1 by adding steps to record and store the time when a mobile unit arrives at each node $P_i$. Like claim 1, claim 23 includes details regarding the characteristics of the data recorded and stored that relates to arrival at a destination. This is not a claim covering generic actions that is devoid of detail relating to implementation of those actions and characteristics of the arrival node. Claim 24 adds steps to assign and store an absolute time period associated with each section of travel $P_jP_k$. This claim also provides concrete detail relating to the absolute time of motion data and its characteristics:

> 23. The method according to claim 1, further comprising the steps of *recording and storing a time $T_i$ of arrival at a node $P_i$ of the traveled distance data* in addition to recording and storing geographical coordinates $x_i$, $y_i$ in the storage device of the mobile unit.[71]

> 24. The method according to claim 1, further comprising the steps of *assigning and storing an absolute time of motion $T_{jk}$ to the sections $P_jP_k$* of the traveled distance data.[72]

The steps in these two claims are directed to recording time information relating to traveled distance data and section data, respectively. Time information can, for example, facilitate the prediction of traffic jams and related problems that occur at certain times of day. These

---

[68] *SiRF Tec., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1332-33 (Fed. Cir. 2010) (finding a method for calculating an absolute position of a GPS receiver to be patent-eligible because the GPS receiver was a machine and was integral to each of the claims-at-issue).

[69] *Id*. at 1332.

[70] *Id*. at 1333.

[71] '836 patent at col. 19 ll. 25-29 (claim 23) (emphasis added).

[72] '836 patent at col. 19 ll. 30-32 (claim 24) (emphasis added).

limitations further ground the claimed invention in an actual technological solution rather than an abstract idea or business method.

Other than noting the dependent claims exist and omitting the details they contain regarding the act of merging section data files, absolute coordinates, the arrival node of traveled distanced data, and the absolute time of motion for traveled distance data, TomTom fails to demonstrate by clear and convincing evidence its assertion that any of the dependent claims should be invalidated.[73] TomTom doesn't even analyze claims 11 and 22-24 under the two-step test articulated in *Mayo*. In fact, the only argument TomTom advances with respect to the dependent claims is that they "recite generic components performing conventional functions."[74]

Dr. Adolph's dependent claims include specific, problem-solving language such as "recording and storing a time $T_i$ of arrival at a node $P_i$" and "assigning and storing an absolute time of motion $T_{jk}$ to the sections $P_jP_k$."[75] These problem-solving phrases are important to Dr. Adolph's invention and cannot be ignored when considering the patentable subject matter question. They demonstrate that the claims "improve an existing technological process" and thereby "transform the process into an inventive application of a formula" constituting patent-eligible subject matter.[76]

### b. Adolph's Asserted Claims Are Patentable As a Matter of Law

To the extent that the Court considers TomTom's motion for judgment on the pleadings to be properly filed (it was not), the Court should find that the asserted claims of the '836 patent

---

[73] *Id.* (focusing on "transmitting," "determining," and "storing").

[74] TomTom Br. (ECF No. 250) at 14.

[75] *Diamond v. Diehr*, 450 U.S. 175, 177 (1981) ("The claim employed a 'well-known' mathematical equation, but it used that equation in a process designed to solve a technological problem in 'conventional industry practice.'").

[76] *Alice*, 134 S. Ct. at 2358 (citing *Mayo*, 132 S. Ct. at 1289).

are patentable as a matter of law. Adolph therefore asks the Court to rule accordingly, not only to deny TomTom's motion, but to affirmatively rule that claims 1, 11, and 22-24 of the '836 patent are directed to patentable subject matter.

## V.     CONCLUSION

The '836 patent is directed to a specific method of recording, storing, and continuously updating geographic location data with certain characteristics in a mobile unit, to enable the creation of digital maps in a new and non-obvious way. To invalidate the asserted claims of the '836 patent under 35 U.S.C. § 101, TomTom is required to provide clear and convincing evidence that (1) each of the asserted claims are directed to an abstract idea; and (2) the elements of each asserted claim fails to transform the idea into a patent-eligible application by sufficiently restricting the scope of the invention.[77] TomTom has failed to meet its burden.

Rather than examine the language of claims 1, 11, and 22-24, TomTom constructed its own "abstract" summary of the thrust of the asserted claims and uses its characterization of them to argue the claims are directed to an abstract idea. This is not clear and convincing evidence of invalidity. TomTom's motion for judgment on the pleadings that the asserted claims are invalid under 35 U.S.C. § 101 should be denied.

---

[77] *Alice*, 134 S. Ct. at 2355 (citing *Mayo*, 132 S. Ct. at 1289).

Respectfully,

Date: August 17, 2015

/s/ Antigone G. Peyton

Antigone G. Peyton (VSB No. 48472)
  antigone.peyton@cloudigylaw.com

William E. Copley (VSB No. 43960)
  wcopley@wmclaw.com
Peter J. Toren (admitted *pro hac vice*)
August J. Matteis, Jr. (admitted *pro hac vice*)
Sean J. Williams (admitted *pro hac vice*)
WEISBROD MATTEIS & COPLEY PLLC
1200 New Hampshire Ave., NW, Suite 600
Washington, DC 20036
Telephone: (202) 499-7901
Facsimile: (202) 478-1795

Clyde E. Findley (VSB No. 48277)
  clyde.findley@cloudigylaw.com
CLOUDIGY LAW PLLC
8300 Greensboro Drive, Suite 1250
McLean, VA 22102
Telephone: (703) 436-2033
Facsimile: (703) 436-2268

*Counsel for Defendant/Counter-Plaintiff*
*Michael Adolph*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 17, 2015, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such electronic filing (NEF) to all counsel of record, including the following counsel for TomTom, Inc., TomTom International BV, and TomTom North America, Inc.:

Brian H. Pandya (VSB No. 72233)
  bpandya@wileyrein.com
Adrienne G. Johnson (VSB No. 78631)
  ajohnson@wileyrein.com
James H. Wallace, Jr. (admitted *pro hac vice*)
  jwallace@wileyrien.com
WILEY REIN LLP
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000
(202) 719-7049

 

       /s/ Antigone G. Peyton
      Antigone G. Peyton (VSB No. 48472)
        antigone.peyton@cloudigylaw.com
      CLOUDIGY LAW PLLC
      8300 Greensboro Drive, Suite 1250
      McLean, VA 22102
      Telephone: (703) 436-2033
      Facsimile: (703) 436-2268

## Appendix A – Selected Cases Upholding Patents Under 35 U.S.C. § 101

- *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1248 (Fed. Cir. 2014) (holding that claims involving "systems and methods of generating a composite web page that combines certain visual elements of a 'host' website with content of a third-party merchant" were patent-eligible)

- *Ameritox, Ltd. v. Millennium Health, LLC*, 2015 U.S. Dist. LEXIS 19665, at *7, 67 (W.D. Wis. Feb. 19, 2015) (holding that "method for quantifying at least one metabolite in a biological sample" was patent-eligible under Section 101, and stressing that even if certain claim steps might incorporate conventional concepts, "when the invention is examined as an ordered combination, the combination of steps produces a new and useful result).

- *AutoForm Engineering GMBH v. Engineering Technology Associates*, 2014 WL 4385855, at *2-3 (E.D. Mich. Sept. 5, 2014) (holding patents related to "computer software that is used to create a tool" was patent-eligible, and even though the invention relied on certain "basic concepts," it also included "numerous limitations that narrow[ed] the scope of the patent.")

- *California Institute of Technology v. Hughes Communications Inc.*, 59 F. Supp. 3d 974, 977, 994 (C.D. Cal. 2014) (claims directed at "[e]rror correction code called an irregular repeat and accumulate ('IRA') code" for improving accuracy and efficiency of data transmission held patent-eligible, and emphasizing that even though claims arguably incorporated mathematical algorithms, those algorithms were "tied to a specific error correction process")

- *Card Verification Solutions, LLC v. Citigroup Inc.*, 2014 U.S. Dist. LEXIS 1375777, at *2, 11 (N.D. Ill. Sept. 29, 2014) (denying Section 101 challenge on motion to dismiss involving method claims "for passing confidential information over an unsecured network with reduced risk of it being captured by an untrusted party" and further cautioning against relying on an "overly formalistic approach[] to subject-matter eligibility" to invalidate patents)

- *Chamberlain Grp., Inc. v. Linear LLC*, 2015 WL 4111456, at *1-2, 9 (N.D. Ill. July 7, 2015) (denying motion to dismiss under Section 101 for claims targeted at, among other things, methods for opening and closing a garage door or gate by sending status signals and requests over a computer network; rejecting argument that claims were patent-ineligible just because "[h]ouses, gates, castles, and city walls have had 'movable barriers' for as long as humans have built dwellings")

- *ContentGuard Holdings, Inc. v. Amazon, Inc.*, 2015 WL 4698436, at *1 (E.D. Tex. Aug. 6, 2015) (denying patent eligibility challenge on motion for judgment on the pleadings involving patents "generally directed toward systems and methods for controlling the use and distribution of digital works in accordance with 'usage rights' through the use of 'trusted systems'")

- *Data Distribution Technologies., LLC v. Brer Affiliates, Inc.*, 2014 U.S. Dist. LEXIS 115543, *2 (D.N.J. Aug. 19, 2014) (denying motion to dismiss for patent-ineligibility under Section 101 on claims involving "'[a] remotely updatable database system method and computer readable medium' that 'includes a user interface, a database of information records, a database manager, and a message server.'")

- *Execware, LLC v. BJ's Wholesale Club, Inc.*, 2015 U.S. Dist. LEXIS 92127, at *21-22, 35 (D. Del. July 15, 2015) (Mag. J.) (holding on motion to dismiss that claims related to "computer interface that allows a user to build a query that will be used to search for and retrieve certain 'text data objects' out of a sect of such objects (e.g., a database or a spreadsheet)" were patent-eligible, and stressing that claims were not "infused with language referencing generic business practice," but instead specifically claimed solution to problem that building custom database queries was often too time consuming.)

- *Fairfield Industries, Inc. v. Wireless Seismic, Inc.*, 2014 WL 7342525, at *3 (S.D. Tex. Dec. 23, 2014) (holding on motion to dismiss that claims related to a "method of seismic data acquisition" involving transmission of seismic data to a central control station through a chain of data acquisition units were patent-eligible, and rejecting argument that motion should have been granted because claims were supposedly directed to "abstract idea of replacing cables … with wireless communications" and "the concept of relaying messages through intermediaries … ha[d] been known and used for years")

- *France Telecom S.A. v. Marvell Semiconductor Inc.*, 2015 WL 925892 (N.D. Cal. Mar. 2, 2015) (denying post-trial motion for judgment of invalidity under Section 101 regarding claims involving "methods for correcting errors in telecommunication and other data transmissions, commonly referred to as 'turbo coding,'" and rejecting argument that subject matter was patent-ineligible because patent purportedly only recited mathematical algorithm)

- *Genetic Techs. Ltd. v. Glaxosmithkline, LLC*, 2014 U.S. Dist. LEXIS 156473, at *1-3 (M.D.N.C.  Aug. 22, 2014) (denying patent-eligibility challenge under Section 101 on motion to dismiss)

- *Helios Software, LLC v. SpectorSoft Corp.*, 2014 WL 4796111, at *17 (D. Del. Sept. 25, 2014) (holding that claims involving "remotely monitoring data associated with an Internet session and controlling network access" were patent-eligible, and noting that defendant had failed to show that the claimed subject matter claimed only "fundamental truths or fundamental principles[,] the patenting of which would pre-empt the use of basic tools of scientific and technological work.")

- *Intellectual Ventures I LLC v. Capital One Financial Corp.*, 2015 U.S. Dist. LEXIS 62601 (D. Md. May 12, 2015) (Special Master) (holding patent-eligible claims involving (1) "a system and method for dynamically retrieving, manipulating, updating, creating, and displaying data from sources of [XML] documents" and (2) "dynamically access[ing] programs, applications, bookmarked URLs, IP addresses, telephone numbers, television

channels, radio stations, user profiles, and the like that are specific to a user via any computer device")

- *Intellectual Ventures I LLC v. Manufacturers & Traders Trust Co.*, 2014 WL 7215193, at *9 (D. Del. Dec. 18, 2014) (holding patent-eligible claim where "central idea … [of claim was] providing a customized web page with content based on the user's profile and website history")

- *Intellectual Ventures I LLC v. Motorola Mobility LLC*, 2015 U.S. Dist. LEXIS 21718, at *4-5, 25-29 (D. Del. Feb. 24, 2015) (holding patent-eligible claims involving "a system and method for 'coupling one or more subscriber customer premise equipment stations with a base station over a shared wireless bandwith using a packet-centric protocol; and allocating the wireless bandwidth and system resources based on contents of packets.")

- *Intellectual Ventures I LLC v. Symantec Corp.*, 2015 WL 1843528, at *2, 19-22 (D. Del. Apr. 22, 2015) (finding that patent "directed to 'screen[ing] computer data for viruses within a telephone network before communicating the computer data to an end user" was patent-eligible).

- *Kenexa BrassRing, Inc. v. HireAbility.com, LLC*, 2015 WL 1943826 (D. Mass. Apr. 28, 2015) (denying patent-eligibility challenge on judgment on the pleadings as to claims involving method of electronically recognizing resume text and organizing the text in a database)

- *Messaging Gateway Solutions, LLC v. Amdocs, Inc.*, 2015 WL 1744343, at *2 (D. Del. Apr. 15, 2015) (granting plaintiff's cross-motion for judgment on the pleadings; holding that claims for "method of using a computer system to facilitate two-way communication between a mobile device and an Internet server" were patent-eligible)

- *Modern Telecom Systems LLC v. Juno Online Services, Inc.*, 2015 WL 1240182, at *8 (C.D. Mar. 17, 2015) (denying Section 101 challenge on motion for judgment on pleadings, and rejecting argument that amounted to nothing more than "a recitation of the elements of each representative claim followed by a conclusory characterization of the claims as 'unlimited,' 'so abstract and sweeping as to cover any and all uses of them,' and 'recit[ing] nothing more than an ineligible concept.'")

- *Protostorm, LLC v. Antonelli, Terry, Stout & Craus, LLP*, 2015 U.S. Dist. LEXIS 73486, at *35-38 (E.D.N.Y. 2015) (stating that invention on "'secure and private online game environment' that recreated sponsor website, required game players to analyze sponsor websites to advance in game play, and set in place an apparatus for dynamically tracking activities and delivering targeted sponsor content in real time" likely went "beyond simply limiting the idea to a technological environment and merely 'applying it,' the … claims include additional features that arguably specify how interactions with the internet are manipulated and recite a specific way to achieve a desired result.")

- *Smartflash LLC v. Apple Inc.*, 2015 WL 661174, at *1, 8 (E.D. Tex. Feb. 13, 2015) (denying Section 101 challenge on motion for judgment on the pleadings for claims involving "data storage and access systems for paying for and downloading digital content such as audio, video, text, software, games, and other types of data," and reasoning that claims recited "specific ways of using distinct[, among other things,] … data types … that amount to significantly more than" an underlying abstract idea)

- *Stoneeagle Servs. v. Pay-Plus Solutions, Inc.*, 2015 U.S. Dist. LEXIS 85789, at *3 (M.D. Fl. July 1, 2015) (finding claims patent-eligible that involved "a health care provider reimbursement system, by which a payor such as an insurance company, makes 'a virtual payment to a medical provider by transmitting a stored-value card account payment of the authorized benefit amount, together with an [EOB].")

- *Trading Technologies International, Inc. v. CQG, Inc*, 2015 WL 774655, at *4 (N.D. Ill. Feb. 24, 2015) (holding that method claims that enabled stock traders to set online fixed price at which to buy stock as prices fluctuated recited patent-eligible subject matter under Section 101, and rejecting argument that patent claimed nothing more than conventional methods of "'setting, displaying, and selecting' data or information")

- *Wavetronix LLC v. Iteris, Inc.* 2015 WL 300726, at *1, 6 (W.D. Tex. Jan. 22, 2015) (finding patent-eligible a method involving "[u]sing radar … [to track] speed and location of vehicles approaching an intersection in real time (dynamically), use[ing] that data to calculate each vehicle's estimated time of arrival at the stop bar, and … determin[ing] whether" approaching vehicles could fall within a "dilemma zone" to report such information to a traffic control unit; emphasizing that patentee had "improved upon [prior] solutions by devising a process which by making use of a mathematical formula enables accurate real-time tracking of vehicles … .")